SCHOOLS
Section 12 of House Bill 1708, Thirty-sixth Legislature, Second Regular Session (1978), intended for codification at 70 O.S. 17-116.3 [70-17-116.3] (1978), violates the provisions of Article V, Section 62, Oklahoma Constitution, for which reason it is unconstitutional. The remaining portions of House Bill 1708, while not considered herein, must be deemed operative and in full force and effect notwithstanding the unconstitutionality of Section 12. The Attorney General has considered your request for an opinion wherein you ask, in effect, the following question: Are the provisions of House Bill 1708, 36th Legislature, Second Regular Session (1978), Chapter _____, O.S.L. 1978, with particular respect to Section 12 thereof, constitutional under the provisions of Article V, Section 62, Oklahoma Constitution ? House Bill 1708, Thirty-sixth Legislature, Second Regular Session (1978), approved with emergency April 26, 1978, is an act which provides for substantial amendments to the provisions of Article XVII, Title 70 O.S., "Teacher's Retirement System" (70 O.S. 17-101 [70-17-101], et seq. (1971), as amended). Sections 11 and 12 of H.B. 1708 in effect create two distinct and optional retirement plans, referred to as Plan I and Plan II, superseding the provisions of 70 O.S. 17-105 [70-17-105] (1977), the previously applicable statutory provision setting forth the singular retirement plan available to all members of the Teacher's Retirement System. Your question essentially asks if the two, newly created and optional, retirement plans are constitutional in light of the requirements of Article V, Section 62, Oklahoma Constitution. To answer your question, initial reference must be made to the subject constitutional provision and the authority and/or restrictions existing thereunder. Article V, Section 62, Oklahoma Constitution, provides: "The Legislature may enact laws to provide for the retirement for meritorious service of teachers and other employees in the public schools, colleges and universities in this state supported wholly or in part by public funds, and may provide for payments to be made and accumulated from public funds, either of the state or of the several school districts. Payments from public funds shall be made in conformity to equality and uniformity within the same classifications according to duration of service and remuneration received during such service." (Emphasis added) Your question primarily arises under the emphasized portion of the above-quoted constitutional provision. This question would appear to be one of first impression inasmuch as there appears to be no previous case law nor prior opinions from this office addressing this question nor interpreting this constitutional provision. In seeking to properly interpret the above-quoted provision, we are accordingly guided by certain well-settled premises of constitutional construction. In this connection, we are mindful of the first rule of construing a constitutional provision, a rule to which all others are subordinate, that being that the meaning of the provision, as understood by those who framed and adopted the Constitution, must be ascertained and given effect. In re Initiative Petition No. 281, State Question No. 441, Okl., 434 P.2d 941 (1967). As in the case of statutory construction, in construing a constitutional provision, effect must be given the intent of the framers or those adopting the provision and such intent must be ascertained, if possible, from the language of the instrument itself. Shaw v. Grumbine, 137 Okl. 95,278 P. 311 (1929). Should the wording of a constitutional provision be found to be plain, clear and unambiguous, the evident meaning must be followed, there being no justification for resort to interpretative aids to arrive at a different meaning. Hines v. Winters, Okl., 320 P.2d 1114
(1958). In the absence of an ambiguity, the natural significance of words or phrases, in their given grammatical arrangement, should control. State ex rel. Kerr v. G.R.D.A., 195 Okl. 8, 154 P.2d 946 (1945). Given the well-settled interpretative guidelines recognized in the above-referred decisions, attention must be directed to the subject constitutional provision. Article V, Section 62, Oklahoma Constitution is a provision adopted by a vote of the people of the State of Oklahoma pursuant to State Question No. 306, Initiative Petition No. 221, adopted at a special election of July 14, 1942. It would appear that the primary purpose for the adoption of this section was to grant constitutional authority to the Oklahoma Legislature to adopt a statutory retirement system for educators and employees of the various state and local education systems. Within its initial provision, Section 62 authorizes the Legislature to enact laws providing for the retirement of teachers and other school employees of the various public schools, colleges and universities of Oklahoma. This section goes on to authorize appropriate payments from public funds for this purpose. The final provision of Section 62, setting forth the constitutional language critical to your question, requires that payments from public funds be made "in conformity to equality and uniformity within the same classifications according to duration of service and remuneration received during such service." We view this language to be substantially two fold. Firstly, the provision appears to clearly authorize the Legislature, in its creation of a teacher's retirement system, to acknowledge classifications among those within the membership of the system. Secondly, the critical language imposes a general restriction or limitation upon the legislative enactment authority so granted, that restriction or limitation being that payments from the public funds of the retirement system authorized for creation must be made "in conformity to equality and uniformity within the same classifications." Reading this latter provision as a whole, we are resolved to the meaning and interpretation that in creating a teacher's retirement system and enacting statutory provisions with regard thereto, the Legislature may create classes of members or beneficiaries within the system. However, with respect to those classes so created, persons within the same class, according to tenure or service and compensation, must receive benefits or payments pursuant to a benefit plan which is equal and uniform. In this connection, it is noted that to be equal and uniform, it would not appear that the law, or plan, must universally operate upon all persons alike. However, to be equal and uniform in operation, the law must operate equally upon all those within the same class for which it was adopted. Refer generally, Crawford v. Smith, 162 Okl. 165, 19 P.2d 964
(1933), Williams v. Hutchens, 187 Okl. 268, 102 P.2d 841
(1940), Special Indemnity Fund v. Farmer,195 Okl. 262, 156 P.2d 815 (1945). It is additionally noted that with respect to that which is "uniform", our Supreme Court has generally recognized that "uniform" connotates general conformity to one pattern or a system indicative of sameness. Modern Order of Praetorians v. Bloom,69 Okl. 219, 171 P. 917 (1918), Naill v. Order of United Commercial Travelers, Etc., 103 Okl. 179, 229 P. 833
(1924). Acknowledging the apparent meaning of the subject Constitutional provision as above expressed, attention must next be directed to Sections 11 and 12 of H.B. 1708, for purposes of determining its compliance or lack thereof with the constitutional mandate. The statutory provisions pertaining to teacher's retirement have a substantial history of amendments since the first plan existing prior to the adoption of Article V, Section 62. Refer, Article XXX, Oklahoma Statutes, 1931, 7169, et seq. However, it may be observed that subsequent to the constitutional amendment, the teacher's retirement plan has been one which applied, with slight and immaterial exceptions, to all members of the system, regardless of position, alike and the same basic requirements respecting contributions and benefits applied to all members equally. The historical basic aspects of determining retirement benefits were (1) percentage of average salary, (2) age and (3) years of service. Under the provisions of the teacher's retirement system statutes, prior to amendment by H.B. 1708, membership within the teacher's retirement system was mandatory for all classified personnel (teachers, administrators, etc.) and optional to non-classified personnel (cooks, janitors, drivers, etc.). 70 O.S. 17-103 [70-17-103] (1977). As stated, with minor exception, regardless of employment position, all members were subject to the identical retirement plan and had contributions and benefits computed upon the same statutory basis. 70 O.S. 17-105 [70-17-105] (1977). Generally, members within the system could retire at age 60 or after 30 years of service. However, full retirement benefits were only available for those who retired at age 62 or older. 70 O.S. 17-105 [70-17-105]. For those who became members subsequent to 1967, retirement benefits could only be received after having at least 10 years of creditable service within the system. 70 O.S. 17-105 [70-17-105]. All members in the system, where applicable, were required to contribute five percent (5%) of their annual salary to the system, such contribution to be based upon an amount not to exceed an average salary of Ten Thousand Dollars ($10,000.00) per year (contribution not to exceed $500 yearly). 70 O.S. 17-108 [70-17-108] (1977). With certain variations in average salary (minimums), benefits for all members were calculated under the same statutory formula. The benefits formula basically consisted of multiplying the member's average salary (which is the average of the member's five highest salary years, not to exceed Ten Thousand Dollars ($10,000.00)) by a statutory percentage, the sum to be further multiplied by the member's number of years of creditable service. 70 O.S. 17-105 [70-17-105]. For example, a member with a Ten Thousand Dollars ($10,000.00) per year salary average who retires at age 62 after 35 years service would have monthly benefits calculated as follows: $10,000 x 1.9% x 1/12 = $15.833 x 35 years = $554.16 As stated, subject to exceptions with respect to minimum average salary used as a base, benefits for all retiring members were calculated upon the above statutory formula. House Bill 1708, which becomes effective July 1, 1978, basically readopts, at Section 11 (70 O.S. 17-116.2 [70-17-116.2] (1978)), as "Plan I", the previously existing retirement plan above explained. Section 11 provides, in part: "The following provisions relating to the making of contributions and the receiving of retirement benefits shall be designated as requirements of Plan I. "A. A member who retires at sixty-two (62) years of age or older or whose retirement is because of disability shall receive a monthly allowance for life equal to one and nine-tenths percent (1.9%) of the member's average salary not exceeding Ten Thousand Dollars ($10,000.00) multiplied by the number of years of creditable service under this plan." House Bill 1708 further provides at Section 12 (70 O.S. 17-116.3 [70-17-116.3] (1978)) that which is referred to as "Plan II". This section provides in part: "A member may file an election with the board of trustees to enroll in Plan II. The following provisions relating to the making of contributions and the receiving of retirement benefits shall be designated as requirements of Plan II. Once a member has elected to enroll in Plan II, that member is precluded from enrolling in Plan I. "A. A member who retires at sixty-five (65) years of age or older or whose retirement is because of disability shall receive a monthly allowance for life equal to two percent (2%) of the member's average salary multiplied by the number of years of creditable service under this plan. No retirement benefits shall be made retroactively. "The retirement allowance shall be subject to adjustment to those members retiring before age sixty-five (65) in accordance with the actuarial equivalent factors adopted by the Board of Trustees. "B. The amount contributed by each member to the retirement system shall be six percent (6%) of the regular annual compensation not in excess of the maximum compensation level. For the period July 1, 1978, through June 30, 1979, the maximum compensation level shall be Fifteen Thousand Dollars ($15,000.00). Effective each July 1, beginning with July 1, 1979, the maximum annual compensation level shall be increased or decreased in the same proportion as the percentage of increase or decrease in the average annual compensation of the members participating in the retirement system and the maximum compensation level shall be established by rounding to the nearest One Hundred Dollars ($100.00). The State Superintendent of Public Instruction shall certify to the Board of Trustees the average annual compensation and the percentage of change from the preceding year on or before January 31 of each year the average salary of the member participating in the retirement system. The certification shall be based on salary payments made for the fiscal year preceding certification. The average salary shall be determined as follows: Total salary for those persons enrolled in the retirement system based on salary payments made for the preceding fiscal year divided by the total number of members." Under the new bill, any member may elect to participate in Plan II. However, absent such an election, a member remains under Plan I and once a member elects Plan II, such member may not thereafter change to Plan I. Section 12. For purposes of calculating benefits, only those years of service under the respective plan may be used. Section 13A, H.B. 1708. While there are various differences between the newly elected Plan II and Plan I, the basic differences are found in (1) retirement age for full benefits, (2) required contributions, (3) the percentage of average salary for benefits and (4) the average salary base upon which benefits are calculated. For full benefits under Plan I, a member must only be in service to age 62. Under Plan II, a member must be in service to age 65 to receive one hundred percent (100%) of benefits available. Under Plan I, a member contributes only five percent (5%) of salary while under Plan II, a member must contribute six percent (6%). A retiring member under Plan I receives, within the formula, one and nine-tenths percent (1.9%) of average salary. A retiring member under Plan II receives two percent (2%) of average salary. Under Plan I, a retiring member's benefits are calculated based upon a percentage (1.9%) of average salary (average of five highest years) which average salary may not exceed Ten Thousand Dollars ($10,000.00). Under Plan II, the retiring member's benefits are calculated based upon a per centage (2%) of average salary which, for fiscal year 78-79, may not exceed Fifteen Thousand Dollars ($15,000.00), and which average salary limit may be increased proportionately each year thereafter based upon annual salary increases. The best manner in which to examine the various different aspects between Plan I and Plan II, would be by reference to an example. As set forth in the example attached as an appendix to this opinion, it can be seen that two retiring members, similarly situated, would receive substantially different benefits depending upon the plan chosen. The example referred to as Example 1 would be applicable to members retiring subsequent to July 1, 1978, at age 62, after 30 years of service. The member in Example 1-A would receive, under Plan I, a fixed benefit of Four Hundred Seventy-five Dollars ($475.00) per month based upon the average salary limitation of Ten Thousand Dollars ($10,000.00) (contributing 5%). The member in Example 1-B, having 25 years service under Plan I and five years service under Plan II (contributing 6%) would receive a Four Hundred Thirty-nine Dollars and 42/100 ($439.42) monthly benefit ($35.58 less than the member retiring under Plan I). As can be seen in this example, the retiring member under Plan II, while making a greater individual contribution, would receive substantially less benefits. This circumstance would invoke the so-called save harmless provision of H.B. 1708, set forth at Section 13A. This section provides: "A. Creditable service in either Plan I or Plan II is cumulative to achieve vesting. Benefits will be paid based upon the years in each plan. "B. Employees who were members of the retirement system on June 30, 1978, and elect to contribute under Plan II shall receive a benefit no less than the sum of the following: "(1) The benefit that the member would receive had all his creditable service accrued under Plan I, and "(2) An annuity which is the actuarial equivalent of the excess of the member's contributions made under Plan II over the contributions that would have been made under Plan I with respect to the same period of service, together with accumulated interest computed at a rate to be determined by the Board of Trustees." In the above-referred example, the retiring member under Plan II would receive, with the annuity, Four Hundred Eighty-two Dollars and Forty-seven Cents ($482.47), Seven Dollars and Forty-seven Cents ($7.47) more than the retiring member under Plan I (refer Example 1-C). Given the basic statutory differences between Plan I and Plan II, as well as the actual projected benefit differences reflected in various considered examples, we are compelled to conclude that the system established under House Bill 1708 is not a system providing for equality and uniformity within the same classes according to compensation and duration of service as required by Article V, Section 62, Oklahoma Constitution. In this connection we note that two teachers identically situated within the same constitutionally recognized class, that is two teachers who have service for identical periods of time, retire at the same age and time and who have received for their respective periods of employment identical salaries, are not treated with equality and uniformity under the new retirement system. As to those areas of most substantial difference we observe that of those within the same constitutional class, one may retire at age 62 and receive full benefits (Plan I) while another, retiring at the same age after the same number of years of employment during which they receive the same salary, would receive only eighty percent (80%) of full benefits (Plan II). We additionally observe substantial difference, inequality and an absence of uniformity within the same constitutionally recognized class with respect to the average salary base used to compute benefits. As noted, under Plan I a retiring member has benefits computed based upon a percentage (1.9%) of average salary, which average salary may not exceed Ten Thousand Dollars ($10,000.00). It may be recognized that for all intents and purposes, assuming annual salary increases consisted with those historically provided, the Plan I formula places an indefinite limitation on those members retiring at the designated retirement age with thirty (30) years service, i.e. Four Hundred Seventy-five Dollars ($475.00) per month. Conversely, Plan II provides for a percentage of average salary (2%) with the average salary base limited in the first year at Fifteen Thousand Dollars ($15,000.00) and with graduated increases thereafter proportionate with subsequent annual salary increases. It can thus be seen that Plan II does not place those limitations on benefits comparably placed upon those under Plan I. We cannot, in this additional respect, view the opposing retirement plans to be uniform and equal as to those within the same constitutionally recognized class. Giving consideration to those distinctions above noted and other distinctions as to persons within the same constitutionally recognized classes, we are compelled to conclude that House Bill 1708 by virtue of its newly created Plan II, does not provide for a system through which payments from public funds are made in conformity to equality and uniformity within the same constitutionally defined classes. Unquestionably, the dual system created by H.B. 1708 in fact provides for non-uniform and unequal payments from public funds to persons within the same constitutionally referred classes. While we cannot conclude that within the meaning of Article V, Section 62, any or all differences in treatment would give rise to a constitutional conflict, we do conclude that the noted differences are substantial within the prospective of the constitutional prohibition and thusly do give rise to violation thereof. In reaching this conclusion, it is acknowledged that as a matter of law, so well settled that no citations of authority are required, all legislative acts must be presumed constitutional and may only be stricken down upon a clear showing of unconstitutionality. Unquestionably, a legislative act may not be declared unconstitutional unless its conflict with the Constitution is clear and certain. Standard Co. Dairy v. Allen,188 Okl. 187, 108 P.2d 164 (1941). However, it must be remembered that a law which is unconstitutional is so because it is either an assumption of power not legislative in nature or because it is inconsistent with some provision of the state or federal constitution. Ex parte Davis, 66 Okl. Cr. 271, 91 P.2d 799 (1939). A legislative enactment evading the terms and clearly expressed or necessarily implied intent of the Constitution is as void as if forbidden in express terms. Trapp v. Cook Construction Co., 240 Okl. 850, 105 P. 667
(1909). With respect to the mandate of Article V, Section 62, it must be observed that where the Constitution confers the power to do a particular act and prescribes the means and manner of doing such act, such is generally deemed exclusive of all others. McCurtain County Excise Bd. V. St. Louis, San Francisco Railroad Co., 340 P.2d 213
(1959). With further respect to the constitutional mandate subject herein, it must be additionally noted that restrictions and limitations upon legislative power must be strictly construed and may not be extended to include matters not covered or implied by the constitutional language used. Tate v. Logan, Okl., 362 P.2d 670 (1961). In determining the optional retirement plan to be in contradiction with the requirements of Article V, Section62, Oklahoma Constitution, we note that such conflict exists substantially by virtue of the newly created Plan II set forth at Section 12 of House Bill 1708. As heretofore noted, Plan I provided at Section 11 of H.B. 1708, is merely a re-enactment of the previously existing retirement plan for all participants, previously found at 70 O.S. 17-105 [70-17-105] (1977). Relative to those constitutional conflicts herein noted, it is apparent that H.B. 1708 is thusly only partially invalid. The unconstitutionality of a part of a legislative act will not affect the validity of the remaining provisions if such remaining provisions are fully operative, unless it is evident that the Legislature would not have enacted the valid provisions with the invalid provisions omitted. Sterling Refining Co. v. Walker, 165 Okl. 45, 25 P.2d 312 (1933). Stated otherwise, if the objectionable parts of a statute are severable in such a way that the Legislature would be presumed to have enacted the valid without the invalid portion, the failure of the latter will not necessarily render the entire statute invalid, but the statute may be enforced as to those portions which are constitutional. Wood Co. v. Russell, 102 Okl. 92, 226 P. 1040 (1924). Clearly, Section 12, H.B. 1708, creating the new and separate retirement system giving rise to the constitutional conflict herein found, is severable from the entire act, and absent that provision, the remaining portions of H.B. 1708 are fully operable. For the reason that Section 11, H.B. 1708, is merely a re-enactment and re-codification of the previously existing retirement plan for all participants, it may be further concluded that this constitutional portion would have been enacted by the Legislature notwithstanding the invalidity created by virtue of Plan II set forth at Section 12. Absent the re-enactment of the prior retirement plan at Section 11, there would exist no provision for determining retirement benefits. Accordingly, we conclude that only Section 12 must be declared unconstitutional with the remaining portions of H.B. 1708 continuing in full force and effect to the extent otherwise applicable. It is, therefore, the opinion o the Attorney General that your question be answered as follows: Section 12 of House Bill 1708, Thirty-sixth Legislature, Second Regular Session (1978), intended for codification at 70 O.S. 17-116.3 [70-17-116.3] (1978), violates the provisions of Article V, Section 62, Oklahoma Constitution, for which reason it is unconstitutional. The remaining portions of House Bill 1708, while not considered herein, must be deemed operative and in full force and effect notwithstanding the unconstitutionality of Section 12. (R. THOMAS LAY) (ksg)